IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

\* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| EMI ENTERTAINMENT WORLD, INC., a Delaware company, et al., | ) ) ) | Civil No. 2:05-CV-26BSJ |
| Plaintiffs, | ) ) | |
| vs. | ) ) | **MEMORANDUM OPINION & ORDER** |
| PRIDDIS MUSIC , INC., a Nevada corporation, RICK PRIDDIS, an individual, AND DOES 1 through 50, | ) ) ) ) ) | |
| Defendants. | ) | |

```
┌─────────────────────────────────┐
│             FILED               │
│  CLERK, U.S. DISTRICT COURT     │
│    May 21, 2007 (1:27pm)        │
│      DISTRICT OF UTAH           │
└─────────────────────────────────┘
```

\* \* \* \* \* \* \* \* \*

The plaintiffs (collectively, "EMI") are related companies that own and control the rights to certain copyrighted works, including hundreds of thousands of musical compositions and their associated lyrics. EMI negotiates and grants licenses to others who wish to use the copyrighted works in exchange for the payment of various license fees, depending on the manner in which the licensees are using or reproducing the songs.

Defendants Priddis Music and Rick Priddis (collectively, "Priddis") sell commercial products relating to *karaoke,* a style of entertainment that originated in Japan in which an amateur singer or singers sing along with recorded music, generally for the amusement of others, often in a private party, public night club or "karaoke bar" setting.[1]

*Karaoke machines* play recordings of well-known songs in which the voice of the original

---

[1]The term *karaoke* is Japanese (*kara*, empty + *oke(sutora)*, orchestra), suggesting that the music is provided by a virtual orchestra rather than a live band. *See Webster's New World College Dictionary* 781 (4th ed. 1999); "Karaoke," *at* http://en.wikipedia.org/wiki/Karaoke.

singer is absent or has been reduced in volume, and the machines usually display the lyrics of each song on a video screen to assist the performer in singing along, using a microphone connected to the machine.  The display of the lyrics may include text color changes synchronized with the music, and may also display visual images that accompany the musical content.

Priddis produces sound recordings designed for use in karaoke machines.  As each song on the Priddis recording is played, the karaoke machine also projects the text of the song's lyrics on a video display against a static blue background in timed relation to the music.  To cue the karaoke performer as to the appropriate time to sing the words, the displayed text of the lyrics changes color from white to yellow as the music progresses.

Priddis has obtained a number of copyright licenses from EMI pertaining to songs used in its karaoke products, including "compulsory licenses" that entitle Priddis to reproduce the musical composition of the songs pursuant to 17 U.S.C.A. § 115(a)(1), and "reprint licenses" that authorize Priddis to reproduce the lyrics of the songs.

EMI insists that Priddis must also obtain so-called "synchronization licenses" for the songs used in its karaoke recordings in order to sell a product that displays the songs' lyrics in timed relation to the music, in contrast to reprinting the text of the lyrics on a printed paper sheet. The license fees exacted from licensees by EMI for "synchronization licenses" are significantly larger than the statutory fees EMI charges for "compulsory licenses" of songs or the discretionary fees EMI typically negotiates for "reprint licenses" for lyrics.  Priddis disputes EMI's claim that synchronization licenses are required for its karaoke products, which display only the text of the lyrics against a static blue background without any additional visual image content.

-2-

**Licensing of Rights in Copyrighted Works**

The Copyright Act of 1976 provides that "[c]opyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression . . . from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."  17 U.S.C.A. § 102(a) (2005).  "Works of authorship" within the meaning of the statute include "literary works," "musical works, including any accompanying words," "motion pictures and other audiovisual works," and "sound recordings," among others.  17 U.S.C.A. § 102(1), (2), (6) & (7).  Under the statute, the owner of a copyright in a work of authorship "has the exclusive rights to do and to authorize any of the following:

> (1) to reproduce the copyrighted work in copies or phonorecords;
> (2) to prepare derivative works based upon the copyrighted work;
> (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
> (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;
> (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and
> (6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

17 U.S.C.A. § 106 (2005).  And "music—in contrast to most other copyrightable subject matter—can implicate from just one to all five of the rights in the 'bundle of rights' granted by copyright law: the reproduction right, the derivative right, the distribution right, the performance right, and the display right."  Don E. Tomlinson & Timothy Neilander, *Unchained Melody: Music Licensing in the Digital Age*, 6 Tex. Intell. Prop. L.J. 277, 289 (1998) (footnote omitted). Indeed, "[t]he owner of copyright in a musical composition has the exclusive right to, and to

authorize others to, reproduce, distribute, perform, display, and prepare derivative works from the copyrighted composition. 17 U.S.C. § 106." *Bridgeport Music, Inc. v. Rhyme Syndicate Music*, 376 F.3d 615, 621 (6th Cir. 2004).

    Once the copyright holder has distributed a music composition to the public, the work becomes subject to the Copyright Act's *compulsory licensing* provisions:

> The Copyright Act provisions that address rights in musical works and the compulsory licensing scheme for sound recordings of those musical works support the conclusion that when producing and selling a sound recording one must secure a license from the copyright owner of the underlying musical work. . . .
> The copyright laws . . . attempt to strike a balance between rewarding the creative labor of authors of original works, and promoting further creativity by allowing public access to their works. *See Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 429, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984).  As applied to the present case, the most relevant example of this balance is the limitation the Act imposes on the exclusive rights of the copyright owner in an original musical work.  That limitation is set forth in Section 115, which provides that the exclusive rights in the musical work under Section 106(1) and (3) are subject to "compulsory licensing" under certain specified conditions. See 17 U.S.C. § 115.
>
> Under Section 115, a party intending to make and distribute a sound recording of a previously published musical work may obtain a compulsory license in that work simply by complying with the statutory requirements, including timely and sufficient notice to the owner of the copyright in the musical work and payment of statutory, or otherwise negotiated, royalties. 17 U.S.C. § 115(a)(1), (b), (c). Thus, the exclusive rights of copyright owners of previously published musical works are limited only in that they are required (hence the term "compulsory") to license the work to a party who has complied with Section 115.

*Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1198-99 (10th Cir. 2005) (footnote omitted).  Priddis asserts that it has already obtained "compulsory licenses" for any musical compositions as to which EMI holds a copyright.  EMI conceded at the June 28, 1006 Pretrial Conference that this is true as to most, if not all of EMI's works that are at issue in this case.

    Music publishers own or administer copyrights in the lyrics of songs, and grant separate

licenses to reproduce the text of the lyrics.  These licenses are often referred to as lyric

permissions or lyric reprint licenses, and Priddis asserts that it has already obtained reprint

licenses for the lyrics accompanying the songs licensed to Priddis under the § 115 compulsory

license system.  Again, EMI conceded at pretrial that in most, if not all cases, this is true.

### The Copyright Act and "Synchronization Licenses"

Though the Copyright Act does not explicitly apply the label, courts have recognized a

copyright holder's right to control the *synchronization* of sound recordings—in particular, sound

recordings of musical compositions—with the content of audiovisual works such as motion

pictures and television programs. As the Sixth Circuit explains:

> "Synchronization" is the process of combining sound recordings of musical
> compositions with visual images.  A "synchronization license" is a license for use
> of a composition in a film, pre-recorded radio or television program, or radio or
> television commercial.  See 2 Lindey On Entertainment, Publishing And The Arts
> § 7.01 (2d ed.2000).  Under copyright law, an entity wishing to synchronize music
> with visual images in a video, motion picture, etc., must obtain a synchronization
> license from the musical composition copyright holder and must also obtain a
> license from the sound recording copyright holder.

*Bridgeport Music, Inc. v. Still N The Water Pub.*, 327 F.3d 472, 481 n.8 (6th Cir. 2003).  In *Agee*

*v. Paramount Communications, Inc.*, 59 F.3d 317 (2d Cir. 1995), the Second Circuit concluded

that "[a] synchronization of previously recorded sounds onto the soundtrack of an audiovisual

work is simply an example of the reproduction right explicitly granted by section 114(b) to the

owner of rights in a sound recording." 59 F.3d at 322.  Indeed, "the legislative history indicates

that Congress intended to proscribe the unauthorized duplication of sound recordings in the

soundtracks of audiovisual works." *Id.*[2]

EMI argues that the graphical display of the text of lyrics on a video screen in timed relation to the playing of Priddis' karaoke music recordings renders them "audiovisual works" under the Copyright Act, and that Priddis is thus required to obtain a synchronization license for those songs in addition to the compulsory and reprint licenses for the music and lyrics that Priddis has already been granted.  Priddis responds that the courts have recognized synchronization rights only with reference to films, motion pictures, videotapes, television programs and commercials, all of which have significant visual image content, and that the video display of the text of song lyrics not accompanied by such image content falls beyond the scope of synchronization rights as defined by the existing case law.  *See, e.g.*, *Bridgeport Music*, 327 F.3d at 481 (quoted above);  *Agee v. Paramount Communications, Inc.*, 59 F.3d at 322-23 (referring to "synchronization of the sound recording with visual images"); *Buffalo Broadcasting Co., Inc. v. American Society of Composers*, 744 F.2d 917, 921 (2d Cir. 1984) ("When the producer wishes to use outside music in a film or videotape program, it must obtain from the copyright proprietor the 'synch' right in order to record the music on the soundtrack of the film or tape."); *Angel Music, Inc. v. ABC Sports, Inc.*, 631 F. Supp. 429, 431 (S.D.N.Y. 1986) ("synchronization rights . . . are required when copyrighted music is synchronized with visual images"); *Freeplay Music, Inc. v. Cox Radio, Inc.*, 404 F. Supp. 2d 548, 551 (S.D.N.Y. 2005).

According to the Second Circuit, "A synchronization license is required if a copyright musical composition is to be used in 'timed-relation' or synchronization with an audiovisual

---

[2]House Report No. 94-1476 explained that "infringement takes place whenever all or any substantial portion of the actual sounds that go to make up a copyrighted sound recording are reproduced . . . in the soundtrack or audio portion of a motion picture or other audiovisual work."

work."  *ABKCO Music, Inc. v. Stellar Records, Inc.*, 96 F.3d 60, 62 n.4 (2d Cir. 1996) (citing 4

Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 24.02[f] (1995)).  The Copyright

Act defines *audiovisual works* as follows:

> "Audiovisual works" are works that consist of *a series of related images* which
> are intrinsically intended to be shown by the use of machines, or devices such as
> projectors, viewers, or electronic equipment, together with accompanying sounds,
> if any, regardless of the nature of the material objects, such as films or tapes, in
> which the works are embodied.

17 U.S.C.A. § 101 (emphasis added).  The Copyright Act distinguishes audiovisual works from

*literary works*:

> "Literary works" are works, *other than audiovisual works*, expressed in words,
> numbers, or other verbal or numerical symbols or indicia, regardless of the nature
> of the material objects, such as books, periodicals, manuscripts, *phonorecords*,
> film, tapes, disks, or cards, in which they are embodied.

*Id.* (emphasis added).

The Copyright Act protects song lyrics as literary works, and does so regardless of the

tangible medium in which the lyrics find expression—including *phonorecords*, which are

"material objects in which sounds, other than those accompanying a motion picture or other

audiovisual work, are fixed by any method now known or later developed, and from which the

sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid

of a machine or device."  17 U.S.C.A. § 101.

As the *ABKCO* panel observed, "Most commonly, synch licenses are necessary when

copyrighted music is included in movies and commercials."  96 F.3d at 62 n.4 (citing *Nimmer on

Copyright* § 24.04[C][1]).  Though EMI tries to minimize the difference between the visual

display of song lyrics and motion pictures, television programs and other audiovisual works,[3] this court is not persuaded that a copyright holder's synchronization right extends to the graphical display of written text, without more.  *Cf. Leadsinger, Inc. v. BMG Music Publishing*, 429 F. Supp. 2d 1190, 1194 (C.D. Cal. 2005) (concluding that where "the visual images and lyrics are connected with the music, it is clear that [a karaoke recording] is an audiovisual work").

In *ABKCO Music, Inc. v. Stellar Records, Inc.*, the defendant Performance Tracks, Inc., a compulsory licensee of ABKCO's music, argued that it had the right to sell "CD+G" compact discs—discs that play instrumental tracks of songs and display the songs' lyrics on a video screen to assist the karaoke singer in performing the song—based on the compulsory licensing provision governing musical compositions.  The Second Circuit disagreed, pointing out that "[s]ong lyrics enjoy independent copyright protection as 'literary works,'" and that "the right to print a song's lyrics is exclusively that of the copyright holder under 17 U.S.C. § 106(1)";  "while a compulsory license permits the recording of a 'cover' version of a song," the *ABKCO* panel explained, "it does not permit the inclusion of a copy of the lyrics.  That requires the separate permission of the copyright holder."  96 F.3d at 64.[4]

---

[3] In what is perhaps an unintended slight to the art of cinematography, EMI argues that "[f]ilms are nothing more than a series of related and changing colors which when dependent upon music for its intended drama and impact, must have the changing colors synchronized with the sound track."  (Plaintiffs' Reply Memorandum in Support of Their Motion for Partial Summary Judgment, filed May 19, 2006, at [1].)

Indeed, many things may appear to be quite similar if one simply ignores their obvious differences.

[4] In rejecting the defendant's argument that its music-and-lyrics "CD+G" karaoke recordings were "phonorecords" not requiring a separate license for the lyrics, the *ABKCO* panel opined that rather than being phonorecords, "CD+G's constitute 'audiovisual works,' since they 'consist of a series of related images'—the lyrics—'together with the accompanying sounds'—the music.  96 F.3d at 65 (citing 17 U.S.C. § 101).  This dictum overlooks the Copyright Act's explicit distinction between audiovisual works and literary works as well as the Acts' express recognition that literary works expressed in words or verbal symbols—such as song lyrics—may be embodied in phonorecords, *see* 17 U.S.C. § 101.  The *ABKCO* panel's dictum thus appears to be unsound.

Generally, an 'image' is a "representation of a person or thing, drawn, painted, photographed, etc."  *Webster's New World College Dictionary* 712 (4th ed. 1999).  If the display of written text equates with a "series of related images," then perhaps printed books should be treated as audiovisual works rather than literary works.

Here, Priddis insists that it has obtained the requisite license to reprint the songs' lyrics, and has simply reprinted copies of those lyrics using a digital medium. To that extent, *ABKCO* supports Priddis' view:

> A time-honored method of facilitating singing along with music has been to furnish the singer with a printed copy of the lyrics. Copyright holders have always enjoyed exclusive rights over such copies. While projecting lyrics on a screen and producing printed copies of the lyrics, of course, have their differences, there is no reason to treat them differently for purposes of the Copyright Act.

*ABKCO*, 96 F.3d at 64. This court agrees.

Both concepts—synchronization rights and karaoke recordings—have been known for many years, yet none of the cases cited by EMI squarely holds that a *synchronization* license is required to produce a sound recording of a musical composition accompanied by displayable text of the lyrics, but without the visual image content that characterizes an audiovisual work.[5] Priddis' karaoke recordings embody both a sound recording of musical compositions and a digitized copy of the text of the songs' lyrics—lyrics protected as literary works by the express terms of the Copyright Act. Absent a series of related visual images, *e.g.*, a motion picture, film or video recording, the display of the lyrics represents the display of a "literary" rather than "audiovisual" work.[6]

Moreover, if Priddis has included a lawful copy of a song's lyrics on its karaoke discs, Priddis need not be concerned with whether the use of its karaoke products by others implicates

---

[5]The Tenth Circuit has not yet addressed the existence or scope of synchronization rights in a published opinion. In this Circuit, at least, EMI's claim appears to present a case of first impression.

[6]The parties stipulate that Priddis had previously obtained three synchronization licenses from EMI as to particular songs, authorizing Priddis to reproduce the songs in a music-plus-visual-images-plus-lyrics format. Priddis insists that it has not used a format that includes visual image content as well as the text of lyrics in producing its karaoke recordings, so that the terms of the synchronization licenses do not apply.

the copyright holder's right to *display* the song's lyrics as a literary work under 17 U.S.C. §

106(5).[7]  A purchaser of a lawful copy of a literary work certainly may read the text of that copy.

Moreover, Congress has expressly provided that:

> (c) Notwithstanding the provisions of section 106(5), the owner of a particular
> copy lawfully made under this title, or any person authorized by such owner, is
> entitled, without the authority of the copyright owner, to display that copy
> publicly, either directly or by the projection of no more than one image at a time,
> to viewers present at the place where the copy is located.

17 U.S.C.A. § 109(c) (2005).[8]

For these reasons, EMI has failed to carry its burden to show that it is entitled to

judgment as a matter of law that Priddis is required to obtain a synchronization license for its

karaoke products that combine sound recordings with the visual display of song lyrics without

the visual image content that would typically constitute an "audiovisual work," such as a motion

picture or video recording.  EMI's motion for partial summary judgment must therefore be

denied.

### Priddis' Motion for Summary Judgment

Priddis has also filed, briefed and argued a motion for summary judgment, asserting that

(1) EMI has failed to establish that it owns or controls the copyrights to the songs that are the

subject of this litigation; (2) Priddis has already "dutifully obtained proper compulsory licenses

to reproduce the musical compositions of each of the subject songs, and reprint licenses for the

---

[7]To "display" a work means "to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process or, in the case of a motion picture or other audiovisual work, to show individual images nonsequentially."  17 U.S.C.A. § 101 (2005).

[8]Actual karaoke performances taking place in a public setting may also implicate the copyright holders' *performance* right, *cf. Morganactive Songs v. K&M Fox Inc.* 2005 WL 3601973, 77 U.S.P.Q.2d 1064 (S.D. Ind. 2005), *Broadcast Music, Inc. v. WPBK, Inc.*, 922 F.Supp. 803 (W.D.N.Y. 1996), but Priddis' conduct in creating and selling sound recordings using the musical compositions for which it holds compulsory licenses, together with a digitized copy of the songs' lyrics for which it holds reprint licenses, does not.

lyrics"; and (3) Priddis does not use any of the formats specified in EMI's "blanket karaoke

synchronization agreement," and is thus not obligated to obtain such synchronization licenses for

its karaoke products.  (Defendants' Notice of Motion and Motion for Summary Judgment, filed

March 15, 2006 (dkt. no. 64), at 2.)[9]  Consequently, Priddis submits, EMI cannot sustain its

copyright infringement claim against Priddis, and Priddis is entitled to summary judgment on

EMI's claim.

> To establish copyright infringement, a plaintiff must prove (1) ownership
> of a valid copyright and (2) unauthorized copying of constituent elements of the
> work that are original.  *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S.
> 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *Jacobsen v. Deseret Book Co.*,
> 287 F.3d 936, 942 (10th Cir. 2002).  A plaintiff's presentation of a certificate of
> registration from the U.S. Copyright Office usually constitutes prima facie
> evidence of a valid copyright and of the facts stated in the certificate. 17 U.S.C. §
> 410(c). Upon presentation of such a certificate, the defendant bears the burden to
> overcome the presumption of validity.  *Autoskill Inc. v. National Educational
> Support Systems, Inc.*, 994 F.2d 1476, 1487 (10th Cir. 1993).  To rebut the
> presumption, however, a defendant sued for infringement "must simply offer
> some evidence or proof to dispute or deny the plaintiff's prima facie case of
> infringement."  *Entertainment Research Group, Inc. v. Genesis Creative Group,
> Inc.*, 122 F.3d 1211, 1217 (1997).

*Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1196 (10th Cir. 2005).

Counsel for Priddis asserts that EMI has not established the first element of its

infringement claim, ownership or control of a valid copyright in the subject works, yet argues in

the very next breath that Priddis has already obtained valid copyright licenses from EMI to

reproduce those same works.  As noted above, in the context of the Pretrial Conference, counsel

for EMI acknowledged that Priddis has already obtained compulsory music and lyric reprint

---

[9]Priddis has also moved to strike EMI's motion for partial summary judgment as untimely.  In effect, Priddis
and EMI have files cross-motions for summary judgment on the synchronization issue, and having ruled on the merits of
that issue, the court denies the motion to strike as moot.

licenses covering many of the songs at issue in this litigation.  If a synchronization license is not required, Priddis' lyric reprint licenses should suffice to permit the reproduction of the lyrics as digitized text embodied in Priddis' karaoke discs.[10]

At this point, there may be some songs on the extensive list as to which there exists a genuine issue as to copyright ownership, compulsory music licensing or lyric reprint licensing, but this appears to be an appropriate topic for examination at a continued pretrial conference—if in fact anything remains of EMI's copyright infringement claim in the wake of this court's ruling on the synchronization issue.  For that reason, summary judgment on these questions is denied. Counsel for the parties must shoulder the burden of sifting the haystack for those few infringing needles that may remain, and identify the same in the context of pretrial.

Concerning the necessity or applicability of a synchronization license for karaoke recordings in which the text of lyrics is displayed in timed relation to Priddis' sound recordings of EMI's musical works, Priddis' motion shall be granted for the same reasons that EMI's motion was denied.

Defendants having demonstrated that there exists no genuine issue of material fact and that defendant is entitled to judgment as a matter of law,

**IT IS ORDERED** that the defendants' motion for summary judgment (dkt. no. 64) is GRANTED IN PART and DENIED IN PART, and plaintiffs' motion for partial summary judgment (dkt. no. 72) is DENIED; defendants' motion to strike plaintiffs' motion for partial summary judgment (dkt. no. 75) is DENIED AS MOOT.

---

[10]At pretrial, counsel for EMI also acknowledged that under Priddis' existing lyric reprint licenses, "you could still make a graphic image of the lyrics and do whatever you wanted with them," so long as they are not displayed in timed relation to the music.  (*See* Transcript of Hearing, dated June 28, 2006, at 40:3-7 (Mr. Zenger).)

**IT IS FURTHER ORDERED** that the above-captioned proceeding is hereby calendared

for a continuing Final Pretrial Conference on **Thursday, June 28, 2007 at 9:30 a..m.**

DATED this ___ day of May, 2007.

BY THE COURT:

_____
BRUCE S. JENKINS
United States Senior District Judge

**IT IS FURTHER ORDERED** that the above-captioned proceeding is hereby calendared for a continuing Final Pretrial Conference on **Thursday, June 28, 2007 at 9:30 a..m.**

DATED this *18th* day of May, 2007.

BY THE COURT:

BRUCE S. JENKINS
United States Senior District Judge

-13-